COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-461-CV

IN THE INTEREST OF K.W. 

AND M.A. 

------------

FROM THE 325TH DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

Appellant Natasha Mitchell, mother of K.W. and M.A., appeals the trial court’s order terminating her parental rights to these two children.
(footnote: 2)  Natasha challenges the constitutionality of section 263.405(i) of the Texas Family Code and raises four issues challenging the factual sufficiency of the evidence to support the trial court’s findings that (1) termination was in the children’s best interest, (2) she exposed the children to environmental endangerment, (3) her course of conduct endangered the children, and (4) she engaged in criminal conduct resulting in incarceration and the inability to care for her children for not less than two years from the date of filing the petition.  We will affirm.

II.  Factual and Procedural Background

Natasha is the mother of K.W. and M.A.  Natasha was thirteen years old and living with some friends when she had K.W.  She worked cleaning houses. 

A. Natasha Commits Assault

On July 14, 2002, Natasha committed the crime of aggravated assault with a deadly weapon.  Natasha assaulted her boyfriend while her children were at a neighbor’s house.  Natasha’s children did not see her commit the crime, but afterwards, they saw her being taken away by the police.  Natasha claims that the children do not remember this because they were one and two years old at the time.  

While she was in jail, Natasha let a friend take care of her children because she did not think that she was going to be incarcerated for very long.  Natasha was not able, however, to post bond; so Natasha’s friend kept her children off and on during the three months that Natasha was in jail.  Natasha was released from jail after receiving probation on the assault charge.  She discovered that her children were no longer with her friend and that her friend had given the children to another woman.  Although this woman was Natasha’s oldest sister’s aunt, Natasha had never had any prior dealings with the woman. 

B. Natasha’s Probation Is Revoked for Drug Use

In October 2005, the trial court revoked Natasha’s probation because she had violated the terms of her probation by using marijuana and cocaine weekly.  Natasha said that while she was using drugs, her children were with her sister Rillar and her mother.  When asked if that was a smart thing to do because her mother had served time in prison for injury to a child, Natasha said that her mother is a changed woman now.  

C. Natasha Places Her Children with Her Sister

While Natasha was serving time in TDC, she placed her children with her sister Rillar.  Prior to going to prison, Natasha had never seen Rillar use drugs and did not have concerns about how Rillar would treat her children.  The only concern that Natasha expressed concerning Rillar’s ability to care for her children stemmed from the fact that Rillar does not have any children of her own, but based on Rillar’s past conduct, Natasha had believed that Rillar would take care of her children.  Moreover, Rillar was the person who had turned Natasha in for violating her probation, which led Natasha to believe that Rillar “would do what was right by [her] children.” 

Natasha had been incarcerated for a month or two when she received reports from her mother that Rillar was neglecting the children.  Nonetheless, Natasha did not take any affirmative steps at that point to arrange for other placement for her children while she served her prison sentence. 

D. CPS Receives Referral on Rillar

Kimberly Russell, a CPS investigator, testified that she
 received a referral in 2005 concerning Rillar for neglectful supervision,
(footnote: 3) drug use, and a lack of food for the children in Rillar’s home.  Russell learned that Rillar was keeping the children because their mother, Natasha, was in prison. 

Russell talked to M.A., who told her that there was food in the home but that he did not like eating ravioli.  M.A. said that he had seen his aunt (Rillar) snorting cocaine in the bathroom.  M.A. said that he knew what cocaine, syrup, weed, marijuana, and crack were.  K.W. did not indicate that he had seen drug use or had been neglected. 

Another part of the referral was for medical neglect of K.W.  When Russell first interviewed K.W., he was limping, and she asked him to take off his shoe and sock.  She saw that his toe was bleeding and asked him what had happened.  He said that he had stabbed himself in the toe.  She brought K.W.’s injury to Rillar’s attention, but Rillar never took K.W. to get it treated.  K.W.’s grandmother ultimately took him to the hospital, where K.W. was diagnosed with osteomyelitis, an infection of the bone. 

The referral also involved an allegation that M.A. and his cousin, who was also living with Rillar, were engaging in sexual acts together.  M.A. told Russell that Rillar had shown him pornography involving two women engaging in sexual acts.  However, M.A. denied engaging in any type of sexual conduct with his siblings or his cousin.

When Russell talked to Rillar, she denied the allegations of neglect.  Russell took Rillar for a urinalysis, and it was negative.  Rillar said that she was tired of being accused of things and that CPS could just take the children. 

Russell said that none of the children mentioned any abuse by their mother.  Russell therefore disposed of the case as “reason to believe” against Rillar for neglectful supervision, medical neglect, and sexual abuse involving M.A. 

E. CPS Caseworker’s Recommendation

La Monica Thomas testified that she is the ongoing CPS caseworker for Natasha’s children.  During one of her visits with K.W. and M.A., she gave them letters that Natasha had written and had to very strongly encourage them to respond to the letters; the children expressed no interest in the letters.  The children made statements about Natasha’s incarceration and absence.  Thomas gathered that K.W. was used to his mother pushing him away and not engaging in a healthy bond with him.  She was in shock about the children’s lack of response to the letters that Natasha had sent. 

Thomas worked to identify family members who would take the children.  She spoke with numerous relatives, including Natasha’s uncle Rayford Taylor, but none were willing to take the children into their homes. 

Thomas developed a service plan for Natasha that encouraged her to follow-up with the services that she was getting in prison, to cooperate with the Department and provide any information for her children, and to give updates on her release date.  Thomas was encouraged that Natasha was participating in some services while she was incarcerated. 

Thomas said that she 
has no doubt Natasha loves her children.  However, she has doubts about Natasha’s ability to parent her children safely and appropriately 
for the long term because of her criminal activity, her lack of contact with CPS in trying to encourage a relationship with the children, and her failure to pursue some kind of bond with her children.  Thomas testified that Natasha’s boys have stated that they love their mom but that they seem very unconcerned about her.  They responded to her letters by saying, “Oh, well. That’s mom. She’s just doing her thing.”  She believes that the boys are somewhat angry with their mom for being incarcerated.  The boys are in therapy now to address issues in their current situation. 

Thomas was also concerned that Natasha will not be able to provide the long-term structure necessary to address the boys’ behavioral issues,
(footnote: 4) which formed as a result of the inconsistencies they encountered while being moved from place to place and bounced around from relative to relative
.  Thomas noted that prior to her incarceration, Natasha was actively engaged in parenting her children with the help of family members, but currently she has lost most if not all of her family’s support. 

Thomas testified that Natasha’s desire for the boys to remain in CPS custody was not an appropriate solution for the boys.  Thomas believed that the boys should have a family with whom they could begin to bond instead of being forced to wait for Natasha to be released.  Thomas said that CPS was actively pursuing an adoptive placement for the boys. 
 Therefore, Thomas believed that it would be in the boys’ best interest to terminate Natasha’s parental rights. 

F. Natasha’s Plan for Reunification

Natasha believed that she had safely and appropriately cared for her boys in the past.  However, she agreed that her commission of a felony offense eliminated her ability to safely and appropriately parent her children because she is confined in TDC. 
 She also agreed that by knowingly using illegal substances and risking revocation of her probation, she hampered her ability to provide a safe and appropriate environment for her children.  
She admitted that she knew that she was putting herself and her children at risk when she engaged in criminal behavior and that she did it anyway.  
She agreed that her sons have been exposed to a chaotic and criminal lifestyle since 2004. 

Natasha testified that she loves her kids.  She said that she made a mistake and that she is trying to better herself while she is in prison by attending Narcotics Anonymous and Alcoholics Anonymous every Saturday, receiving her GED and starting college prep courses, getting on-the-job training to be a cook, and completing cognitive intervention classes to help her think through things clearly.  After she is released, she plans to go to Exodus Ministry, a halfway house in Dallas that she has researched, because it provides an environment for women with children.  She has also taken steps to attend Waco College to become a chef.  She stated that she wants to make things up to her children for being away from them for two years. 

Natasha also believed that her sons deserve a stable home.  
However, 
she asked the court to order CPS to keep her children in its care until she is released from prison so she could have the opportunity to again attempt to take care of them. 
 She testified that it seemed fair to ask her sons to wait for her to be released from prison because they want to be with her and they know that she loves them.  On the day of her arrest, Natasha said that she promised her boys
 things would be different when she was released from jail.  She said that she has taken her rehabilitation seriously and has been a good team player in the kitchen. 
 Therefore, Natasha
 testified that she does not believe that it is in the best interest of her children to terminate her parental rights. 

G. Trial Court’s Ruling

After hearing the above evidence, the trial court stated,

It’s human nature, and it’s my nature, that when I’m presented with a situation where I haven’t dealt with a person before and they’re asking for a second chance, that I want to give them that second chance.  I want to believe in them.  I want to afford them the opportunity to do better, and I think from your testimony, that having gone to jail, that you’ve finally grown up.

You’re an adult now, and you recognize your responsibilities.  You have goals for yourself, and you have goals for your children, and I think you’ve done well, and I hope you continue to do well because you’ve had it rough.  It’s no picnic being pregnant at 13, and that’s indicative to me of the type of home that you had at that time, and I think you’ve done the best that you can to survive and to make it.

But what I find with a lot of these CPS cases is that by the time I get them and by the time I have contact with the parents for the first time, often, such as today with you, the kids are out of time.  They don’t have any more time to give the parents the ability to get their act together, and although I think you’re on the road to getting your act together, there’s still too many if’s:  It’s if you get out in December of 2007.  It’s if you are able to maintain the type of home that they need after that, and then there’s the if that you can do it for any length of time.

I would like to bet on you just because I want you to succeed, but my responsibility is to these children and what I think is in their best interest, and they don’t have any more of their youth for me to gamble with, to bet. 

Thereafter, the trial court terminated Natasha’s parental rights to K.W. and M.A. after finding by clear and convincing evidence that Natasha had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being
, and knowingly engaged in criminal conduct that has resulted in a conviction of an offense and imprisonment or inability to care for the children for not less than two years from the date of filing the petition and that termination of Natasha’s parental rights was in K.W.’s and M.A.’s best interest. 

H. Post-Trial Filings

Twenty days after the judgment was signed, Natasha filed her motion for new trial, statement of points on appeal, notice of appeal, and affidavit of indigence.  Nine days later, the trial court overruled Natasha’s motion for new trial, found that she was indigent and that her appeal was not frivolous, and appointed appellate counsel. 

III.  Section 263.405(
i)
 And The Separation Of Powers Doctrine

In her first issue, Natasha argues that section 263.405(i) violates the separation of powers doctrine and the Due Process Clause.  In a recent en banc decision, this court held that
 section 263.405(i) is void as a violation of the separation of powers provision of the Texas constitution.  
See In re D.W.
, No. 02-06-00191-CV, 2007 WL 467328, at *12 (Tex. App.—Fort Worth Feb. 19, 2008, no pet. h.).  We therefore sustain Natasha’s first issue
.
(footnote: 5)
IV. 
 
Burden of Proof and Standard of Review

Having held section 263.405(i) to be unconstitutional and thus not a bar to our consideration of issues not raised in Natasha’s original statement of points, we turn now to the merits of her second through fifth issues.

A parent’s rights to “the companionship, care, custody, and management” of his or her children are constitutional interests “far more precious than any property right.”  
Santosky v. Kramer
, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); 
In re M.S.
, 115 S.W.3d 534, 547 (Tex. 2003). 
“While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.”
  In re C.H.
, 89 S.W.3d 17, 26 (Tex. 2002).
  In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child’s right to inherit. 
 T
EX
. F
AM
. C
ODE
 A
NN
. § 161.206(b) (Vernon Supp. 2007); 
Holick v. Smith
, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  
Holick
, 685 S.W.2d at 20-21;
 In re E.M.N.
, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the Texas Department of Family and Protective Services (TDFPS) must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  
Tex. Fam. Code Ann.
 § 161.001 (Vernon Supp. 2007);
 In re J.L.
, 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  
Tex. Dep't of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence.  T
EX
. F
AM
. C
ODE
 A
NN
. §§ 161.001, 161.206(a); 
In re J.F.C.
, 96 S.W.3d 256, 263 (Tex. 2002).  This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. 
 
In re G.M.
, 596 S.W.2d 846, 847 (Tex. 1980); 
In re C.S.
, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied).  It is defined as the “measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.”  
Tex. Fam. Code Ann.
 § 101.007 (Vernon 2002).

Accordingly, in 
reviewing the evidence for factual sufficiency, we must give due deference to the fact-finder’s
 
findings and not supplant the judgment 
with our own.  
In re H.R.M.
, 209 S.W.3d 105, 108 (Tex. 2006)
.  We must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated 
section 161.001(1)(D) or (E) and that the termination of the parent’s parental rights would be in the best interest of the child.  
C.H.
, 89 S.W.3d at 28. 
 
If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.  
H.R.M.
, 209 S.W.3d at 108. 

V.  Factually Sufficient Evidence of Endangerment

In her third and fourth issues, Natasha argues that the evidence is factually insufficient to establish that she endangered her children.  TDFPS argues that there is ample evidence to support the trial court’s endangerment findings under sections 161.001(1)(D) and (E) of the family code.

Endangerment means to expose to loss or injury, to jeopardize.  
Boyd
, 727 S.W.2d at 533; 
In re J.T.G.
, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); 
see also In re M.C.
, 917 S.W.2d 268, 269 (Tex. 1996).  To prove endangerment under subsection (D), TDFPS had to prove that Natasha (1) knowingly (2) placed or allowed her children to remain (3) in conditions or surroundings that endangered their physical or emotional well-being.  
See
 
Tex. Fam. Code Ann. 
§ 161.001(1)(D).  Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the children’s physical well-being was the direct result of Natasha’s conduct, including acts, omissions, or failures to act.  
J.T.G.
, 121 S.W.3d at 125; 
see
 
Tex. Fam. Code Ann.
 § 161.001(1)(E).  Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.  
J.T.G.
, 121 S.W.3d at 125; 
see
 
Tex. Fam. Code Ann.
 § 161.001(1)(E).  However, it is not necessary that the parent’s conduct be directed at the children or that the children actually suffer injury.  
Boyd
, 727 S.W.2d at 533; 
J.T.G.
, 121 S.W.3d at 125.  The specific danger to the children’s well-being may be inferred from parental misconduct standing alone.  
Boyd
, 727 S.W.2d at 533; 
In re R.W.
, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).  To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the children’s birth.  
In re D.M.
, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

Stability and permanence are paramount in the upbringing of children.  
See In re T.D.C.
, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied).  A fact-finder may infer from past conduct endangering the well-being of the children that similar conduct will recur if the children are returned to the parent.  
See In re D.L.N.
, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), 
disapproved on other grounds by
 
J.F.C.
, 96 S.W.3d at 256, 
and
 
C.H.
, 89 S.W.3d at 17.  Drug use and its effect on a parent’s life and her ability to parent may establish an endangering course of conduct.  
Dupree v. Tex. Dep’t of Protective & Regulatory Servs.
, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ).

Evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child will support a finding that a parent engaged in a course of conduct that endangered the child’s well-being.  
J.T.G.
, 121 S.W.3d at 133.  While imprisonment alone does not constitute a continuing course of conduct that endangers the physical or emotional well-being of a child, it is a fact properly considered on the issue of endangerment.  
Boyd
, 727 S.W.2d at 533-34; 
R.W.
, 129 S.W.3d at 743-44
.

The record contains substantial evidence of subsection (D) environmental endangerment and subsection (E) course of conduct endangerment to the physical or emotional well-being of the children.  Because the evidence concerning these two statutory grounds for termination is interrelated, we consolidate our examination of it.  
See J.T.G.
, 121 S.W.3d at 126.

The record demonstrates that Natasha had a history of illegal drug use.  Natasha admitted that she had used marijuana and cocaine weekly while she was on probation, knowing that she risked revocation of her probation and that she was hampering her ability to provide a safe and appropriate environment for her children.  In addition to using illegal drugs, the record reveals that Natasha had a criminal conviction for assaulting her boyfriend and that her children were present when she was arrested.  The record also demonstrated that Natasha relied on others to parent her children while she was in jail, while she was using drugs, and while she was in prison and that the people whom she chose to watch her children often passed her children on to other people, exposed the children to drugs and pornography, and neglected them.  Although Natasha claims that she did not know before she went to prison that Rillar was using drugs and would neglect her children, Natasha did not attempt to find another placement for her children once she was alerted to the problems with Rillar’s neglectful care of her children.

We have carefully reviewed the entire record.  Giving due consideration to evidence that the fact-finder could reasonably have found to be clear and convincing, we hold that a reasonable trier of fact could have formed a firm belief or conviction that 
Natasha knowingly placed K.W. and M.A. in conditions and engaged in conduct that endangered the children’s physical or emotional well-being.  
See 
Tex. Fam. Code Ann.
 § 161.001(1)(D), (E);
 J.F.C.
, 96 S.W.3d at 265-66; 
C.H.
, 89 S.W.3d at 25; 
J.T.G.
, 121 S.W.3d at 124; 
In re T.J.
, No. 02-05-00353-CV, 2006 WL 820518, at *6 (Tex. App.—Fort Worth Mar. 30, 2006, no pet.) (mem. op.) (holding that mother’s and father’s criminal history and illegal drug use provided sufficient basis to establish environmental endangerment and course of conduct endangerment).
  Accordingly, we hold that the evidence is 
factually sufficient to support the trial court’s finding on environmental endangerment and course of conduct endangerment.  We overrule Natasha’s third and fourth issues.

Natasha also challenges the factual sufficiency of another statutory ground for termination that was alleged by TDFPS.  
Only one finding under section 161.001(1) is necessary, however, to support a judgment of termination.
  Tex. Fam. Code Ann.
 § 161.001(1); 
In re J.J.O.
, 131 S.W.3d 618, 630 (Tex. App.—Fort Worth 2004, no pet.); 
see also Tex. Dep’t of Human Servs. v. E.B.
, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh’g).  Accordingly, because we have held that factually sufficient evidence exists to support the trial court’s finding under family code section 161.001(1)(D) and (E), we need not address Natasha’s fifth issue.  
See
 
Tex. Fam. Code Ann.
 § 161.001(1); 
Tex. R. App. P.
 47.1; 
J.J.O.
, 131 S.W.3d at 630.

VI.  Termination Was In The Children’s Best Interest

In her second issue, Natasha argues that the evidence is factually insufficient to support the trial court’s finding that termination of her parental rights was in the children’s best interest.  TDFPS argues that there is ample evidence to support the trial court’s “best interest” finding.
 

Prompt and permanent placement of the child in a safe environment is presumed to be in the child’s best interest.
  Tex. Fam. Code Ann. 
§ 263.307(a) (Vernon 2002).  There is also a strong presumption that keeping a child with a parent is in the child’s best interest
.  In re R.R.
, 209 S.W.3d 112, 116 (Tex. 2006).  Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:  (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.
  Holley v. Adams
, 544 S.W.2d 367, 371–72 (Tex. 1976).  

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  
C.H
., 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  
Id.
  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.  
Id.

Regarding the first factor, the children did not testify at trial.  However, the evidence demonstrated that Natasha had not seen her sons since October 2005, that they were not receptive to her letters, and that they seemed angry with her for being incarcerated.  Thomas testified that there is not a good bond between Natasha and her boys; however, Natasha claimed that there was a good bond and that their love for one another was mutual. 

Regarding the second factor—the children’s present and future physical and emotional needs—Thomas testified that the boys do not have any health concerns or medical problems that would preclude them from being adopted.  However, Thomas said that the boys have some behavioral issues that will require some structure and a therapeutic environment that she does not believe would be present if the boys went back to Natasha after her release.  The boys are currently in therapy to address their anger with their mother and other issues. 

The environmental endangerment and endangering course of conduct discussion above addressed the third, fourth, and eighth factors—the present and future physical and emotional dangers to the children, as well as Natasha’s parenting abilities, or lack thereof, and her acts and omissions.

Concerning the fifth factor, Natasha attempted to
 better herself while in prison by attending Narcotics Anonymous and Alcoholics Anonymous every Saturday, receiving her GED and starting college prep courses, getting on-the-job training to be a cook, and completing cognitive intervention classes.  After she is released, she plans to go to Exodus Ministry and to attend Waco College to become a chef.  

Regarding the parties’ plans for the children—the sixth factor—Natasha testified that she is not in a position at this moment to care for her children because she is in prison.  Natasha would like CPS to keep her children in its care until she is released from prison to see if she is able to take care of them. 
 She believes that it is fair to ask her sons to wait for her to be released from prison because she knows that they want to be with her and that they know she loves them.  
Therefore, s
he does not believe that it is in the best interest of her children to terminate her parental rights because she is bonded with her children. 

CPS requested that Natasha’s parental rights be terminated because doubts existed concerning Natasha’s ability to safely and appropriately parent her children for the long term due to her criminal activity, her lack of contact with CPS in trying to encourage her relationship with the children, her failure to pursue a stable bond with her children, and her lack of family support. 
 Thomas believes that the boys deserve to have a family with whom they can begin to bond instead of waiting for Natasha to be released.  Thus, CPS is actively pursuing an adoptive placement for the boys. 

Regarding the stability of the proposed placement—the seventh factor—the evidence demonstrated that terminating Natasha’s parental rights would allow CPS to pursue adoptive placements for the boys, which would allow them to have the stability lacking in their current situation.

Finally, concerning the ninth factor—any excuse for the parents’ acts or omissions—Natasha admitted that she made mistakes and that she was attempting to turn her life around while she was in prison.

Although Natasha argues that the children could have remained in CPS care without resorting to termination, the trial court heard testimony from Thomas, the children’s ongoing CPS caseworker, that termination of Natasha’s parental rights was in the children’s best interest to allow them to be adopted and to have a stable home.  Giving due consideration to evidence that the fact-finder could have reasonably found to be clear and convincing, and based on our review of the entire record, we hold that a reasonable trier of fact could have formed a firm belief or conviction that the termination of Natasha’s parental rights would be in the children’s best interest.  
See In re S.M.L.
, 171 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding that clear and convincing evidence existed that termination of father’s parental rights was in child’s best interest where, among other factors, father was incarcerated at time of termination hearing and had a pattern of criminal and violent conduct).  Accordingly, we hold that the evidence is factually sufficient to support the trial court’s best-interest finding.  We overrule Natasha’s second issue.

VII.  Conclusion

Having sustained Natasha’s first issue, but having overruled her second through fourth issues and not reaching her fifth issue, we affirm the trial court’s order terminating her parental rights to K.W. and M.A.

SUE WALKER

JUSTICE

PANEL F:  DAUPHINOT, HOLMAN, and WALKER, JJ.

DELIVERED: February 28, 2008

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
Natasha had other children, but K.W. and M.A. are the only children involved in this appeal.  Moreover, the fathers of K.W. and M.A. also had their parental rights terminated, but the fathers are not involved in this appeal.

3:
In December 2005, police picked up the children because they were walking down the street at 8 p.m. unsupervised.

4:
Thomas testified that 
the children have parents and grandparents who have been incarcerated; that they have been exposed to drugs, prostitution, and pornography; and that M.A. knows that his father raped his grandmother. 

5:
Because of our disposition of Natasha’s first issue, we need not address the subissue that she raises regarding whether section 263.405(i) violates the Due Process Clause.  
See
 
Tex. R. App. P.
 47.1; 
D.W.
, 2007 WL 
467328, at *12 
n.99.